## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Kirk C. Bangstad,<br><br>Plaintiffs,<br><br>vs.<br><br>Kristi Noem, Todd Lyons, The Department of Homeland Security, and United States Immigration and Custom Enforcement<br><br>Defendants, | Case No. |

## CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff Kirk C. Bangstad, by and through his attorney of record, Frederick Melms of Melms Law, brings this Complaint for Declaratory and Injunctive Relief against Defendants Kristi Noem, Todd Lyons, The Department of Homeland Security, and United States Immigration and Custom Enforcement. Plaintiff requests that this Court certify a class consisting of all residents of Wisconsin who, since January 20, 2025, have been, or are at imminent risk of being, deprived of rights secured by the First, Fourth, and Fifth Amendments to the United States Constitution as a result of ICE's policy of conducting civil immigration enforcement operations with officers acting while masked or without visible identification, and grant declaratory and injunctive relief on behalf of that class. Plaintiff seeks a declaration that the policies of The Department of Homeland Security and United States Immigration and Custom Enforcement which permit

their officers to conduct official operations while masked and without identifying insignia is unconstitutional under the First, Fourth, and Fifth Amendments to the United States Constitution, and that the policies were adopted in violation of the Administrative Procedure Act. Plaintiff further seeks an injunction prohibiting ICE officers from conducting enforcement operations without identifying insignia and while masked.

## INTRODUCTION

1. This action arises from the unconstitutional and unlawful practices of the Department of Homeland Security ("DHS") and the United States Immigration and Customs Enforcement ("ICE") in conducting civil immigration enforcement operations in Wisconsin. ICE officers have repeatedly carried out "raid-style" arrests in residential neighborhoods and public spaces, arriving not as identifiable law enforcement but as heavily armed soldiers. They wear coyote-brown tactical gear with plate carriers, FAST helmets, combat boots, and long guns slung across their chests. Their faces are concealed behind balaclavas or masks, and their vests often lack nameplates or insignia. To the families and bystanders who witness these operations, ICE officers appear indistinguishable from masked paramilitary forces rather than public servants enforcing civil law.

2. The Constitution does not grant ICE the authority to terrorize communities through the use of military-style raids for civil immigration enforcement. Unlike combat zones such as Fallujah or Kandahar, where such tactics might be expected, ICE is not engaged in warfare. ICE is enforcing civil immigration violations, not pursuing armed insurgents. Yet its officers storm neighborhoods as though they are combatants in a foreign conflict, despite the reality that their targets are often elderly men and women, mothers with small children, or lawful residents mistakenly swept into dragnet operations.

3. These raids are particularly alarming because ICE officers conduct them without proper insignia or identification. Residents cannot discern whether the masked and heavily armed figures approaching their homes are legitimate government agents, criminal impostors, or vigilantes. This lack of accountability not only violates constitutional protections but also places the public in immediate danger, as people confronted by masked and unidentified armed men may act to defend themselves or their families.

4. The use of raid-style arrests with masked and unidentified officers has drastically increased in the last six months. Across Wisconsin, families have reported ICE officers arriving at dawn in armored vehicles, surrounding homes, and breaching doors with rifles at the ready. Witnesses describe scenes indistinguishable from military raids broadcast during wartime, except they

are happening in Milwaukee, Madison, Green Bay, and small towns across the state.

5. Plaintiff brings this action as a member of a proposed class of all Wisconsin residents who are subject to these practices. The unlawful conduct at issue does not target one household or community, but rather threatens every person in the state. When federal agents are permitted to operate masked and unidentifiable, any individual may be subjected to a raid without knowing whether those confronting them are lawful government actors or criminals exploiting ICE's tactics for their own ends.

6. The Constitution requires transparency, accountability, and lawful process from government officials who exercise coercive power. The First, Fourth, and Fifth Amendments protect individuals from arbitrary government intrusion, retaliation for protected speech, and deprivation of liberty without due process. ICE's current policy of deploying masked, militarized agents for civil enforcement is fundamentally incompatible with these constitutional guarantees.

7. The policy of ICE to permit its officers to conduct military-style raids against unarmed women, children, and elderly individuals while masked and wearing tactical gear devoid of identifying insignia violates the First Amendment because it strips citizens of their ability to petition the government for a

redress of grievances. The Petition Clause guarantees not only the right to speak, but also the right to hold government officials accountable by naming them, documenting their conduct, and demanding remedies. When ICE officers intentionally conceal their identities during civil immigration operations, Wisconsin residents who suffer or witness abuses cannot know which officer to report, cannot press for investigations of specific misconduct, and cannot pursue meaningful administrative or judicial relief. This concealment transforms the right to petition into an empty promise, causing immediate and irreparable harm by making accountability impossible in practice.

8. The same policy also violates the Fourth Amendment by converting civil enforcement into unreasonable searches and seizures disguised as combat operations. Officers clad in coyote-colored tactical gear, wearing plate carriers and ballistic helmets, armed with rifles, and concealing their identities with masks while lacking insignia present the unmistakable image of a paramilitary assault rather than a lawful arrest. What should be routine administrative enforcement of immigration laws has instead become a frightening intrusion that undermines the very principles on which this nation was founded.

9. The practices of ICE officers also violate the Fifth Amendment by depriving families and individuals of liberty without due process of law. ICE's policy

of allowing officers to conceal their identities emboldens them to seize people without presenting warrants supported by probable cause, without identifying themselves, and without providing those arrested with notice of their rights or procedures. Wisconsinites watch as their loved ones are taken away by armed, anonymous men. Such seizures are the very definition of arbitrary detention and corrode the fundamental due process protections that the Framers enshrined in the Constitution to safeguard the people from government overreach.

10. The policies permitting ICE to violate the Constitution on a daily basis were adopted in violation of the Administrative Procedure Act. Neither DHS nor ICE issued lawful rules, provided notice, or sought public comment before instituting militarized, raid-style operations as standard practice. Instead, ICE quietly normalized the deployment of masked and unmarked tactical units for civil arrests, despite lacking statutory authority to do so. By adopting this practice in secret, ICE acted arbitrarily and capriciously, disregarding the procedures Congress established to ensure transparency and accountability in agency action.

11. The consequences of these practices reverberate throughout Wisconsin communities. Families live in constant fear of an unexpected knock at the door in the predawn hours, never certain whether the armed men outside are

legitimate federal officers or criminals exploiting the appearance of authority. Children watch masked men carrying rifles seize their parents, imprinting trauma that will remain for years. Entire neighborhoods are destabilized by the spectacle of these raid-style operations, eroding trust in government institutions that are supposed to protect rather than terrorize.

12. As a direct result, Wisconsin residents endure a climate of fear that suppresses civic life. Parents hesitate to attend school functions, neighbors avoid community meetings, and congregants fear gathering for worship, because they cannot be sure masked and unidentified ICE officers will not descend without warning. This pervasive fear chills core First Amendment freedoms, discouraging speech, association, and the ability to petition government for redress of grievances. The constitutional injury is ongoing and irreparable, as the right to participate in civic life loses meaning when exercised under the shadow of armed and anonymous raids.

13. These policies also create fertile ground for criminal impersonation. Because ICE officers deliberately conceal their names and insignia, the public has no reliable means of distinguishing lawful officers from impostors. Bad actors can exploit this ambiguity by posing as ICE agents, gaining access to homes and families through fraud and coercion. This dangerous environment heightens the risk of kidnappings, assaults, and other crimes, compounding

the harms caused by ICE's refusal to operate with transparency and accountability.

14. There is no legitimate governmental interest in terrorizing Wisconsin residents through masked, militarized tactics. Civil immigration enforcement does not require officers to wear balaclavas, plate carriers, or FAST helmets, nor does it require long guns pointed at unarmed families. If the federal government seeks to enforce civil laws, it must do so openly, lawfully, and in compliance with constitutional safeguards, not through the use of paramilitary raids that blur the line between legitimate enforcement and lawless intimidation.

15. The conduct of ICE officers shocks the conscience. In the United States, civil enforcement is not supposed to resemble military combat. The decision to outfit officers in tactical gear, conceal their identities, and descend upon neighborhoods with armored vehicles and long guns is not only unnecessary but reckless. It represents an abuse of governmental power that undermines constitutional protections and public trust.

16. The Constitution demands better. Government power must be exercised in a manner consistent with transparency, accountability, and the rule of law. The people of Wisconsin cannot be left to wonder whether the masked men with rifles outside their homes are lawful officers or criminals. This Court has both

the authority and the duty to enforce the Constitution and protect the public from these unlawful practices.

17. Plaintiff and the proposed class bring this action to stop these unlawful practices. The relief sought includes declaratory and injunctive relief prohibiting ICE officers from conducting raids while masked or unidentifiable, prohibiting the use of military-style tactics in civil immigration enforcement, and requiring compliance with constitutional and statutory protections.

18. Plaintiff seeks to vindicate not only his own rights but the rights of all Wisconsin residents who face the imminent threat of being subjected to these unconstitutional raids. Without judicial intervention, ICE will continue to expand these practices, normalizing paramilitary tactics in civil law enforcement and placing all residents at risk.

19. Accordingly, Plaintiff, on behalf of himself and all similarly situated residents of Wisconsin, seeks relief to end ICE's unconstitutional policy of masked, militarized civil immigration raids, restore lawful enforcement practices, and protect the fundamental rights of all Wisconsin residents.

## **PARTIES**

20. Plaintiff Kirk C. Bangstad is a resident of Dane County, Wisconsin and brings this action individually and as a representative of a proposed class consisting of all residents of Wisconsin who are subject to the unlawful practices described herein.

21. Defendant United States Department of Homeland Security ("DHS") is a cabinet-level agency of the United States government headquartered in Washington, D.C. DHS is responsible for formulating and overseeing immigration enforcement policies nationwide, including those carried out within the State of Wisconsin. DHS exercises supervisory authority over its component agencies, including U.S. Immigration and Customs Enforcement.

22. Defendant U.S. Immigration and Customs Enforcement ("ICE") is a federal agency within DHS, headquartered in Washington, D.C., charged with enforcing federal immigration laws inside the United States. ICE officers operate throughout Wisconsin, including in residential neighborhoods, courthouses, schools, and workplaces. ICE is directly responsible for the raid-style enforcement actions challenged in this Complaint.

23. Defendant Kristi Noem is the Secretary of the United States Department of Homeland Security, who was at all times relevant to this action acting under the color of law.  In her official capacity, Secretary Noem is the chief executive of DHS and bears ultimate responsibility for setting, approving, and

implementing immigration enforcement policies nationwide, including those challenged in this Complaint. She is sued in her official capacity for authorizing, permitting, and failing to restrain the use of masked, militarized, and unidentifiable enforcement tactics by ICE officers in Wisconsin.

24. Defendant Todd Lyons is the Acting Director of U.S. Immigration and Customs Enforcement, who was at all times relevant to this action acting under the color of law. In his official capacity, Director Lyons is responsible for the leadership, direction, and supervision of ICE and its operations nationwide, including those within the State of Wisconsin. He is sued in his official capacity for his role in promulgating and enforcing the policies that permit ICE officers to conduct enforcement operations while masked, dressed in tactical gear, and devoid of identifying insignia.

## **JURISDICTION AND VENUE**

25. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 28 USCS § 1331, because this action arises under the Constitution of the United States, specifically the First, Fourth, and Fifth Amendments, and federal law, specifically the Administrative Procedure Act, 5 USCS § 702.

26. This Court has personal jurisdiction over Defendant Department of Homeland Security pursuant to 28 U.S.C. § 1391(e) 28 USCS § 1391, as this action is brought against a federal agency of the United States.

27. This Court has personal jurisdiction over Defendant Immigration and Customs Enforcement pursuant to 28 U.S.C. § 1391(e) 28 USCS § 1391, as this action is brought against a federal agency of the United States.

28. This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(e) 28 USCS § 1391, as Plaintiff resides in the Western District of Wisconsin, and no real property is involved in this action.

## CLASS ALLEGATIONS

29. Plaintiff brings this action on behalf of himself and all residents of Wisconsin who, since January 1, 2025, have been, or are at imminent risk of being, deprived of rights secured by the First, Fourth, and Fifth Amendments to the United States Constitution as a result of ICE's policy of conducting civil immigration enforcement operations with officers acting while masked or without visible identification to Rule 23 of the Federal Rules of Civil

Procedure. Certification of the proposed class is proper because the requirements of numerosity, commonality, typicality, and adequacy are satisfied, and because the relief sought, declaratory and injunctive relief, applies uniformly to all class members.

30. The proposed class is defined as all residents of Wisconsin who, since January 1, 2025, have been, or are at imminent risk of being, deprived of rights secured by the First, Fourth, and Fifth Amendments to the United States Constitution as a result of ICE's policy of conducting civil immigration enforcement operations with officers acting while masked or without visible identification. This definition is precise, objective, and ascertainable. Each class member shares a common exposure to the systemic policies and practices of Defendants, namely the operation of ICE officers without visible identification in public enforcement actions.

31. The class is so numerous that joinder of all members is impracticable. Wisconsin has millions of residents, each of whom is subject to potential encounters with unidentified ICE officers. The risk of constitutional violations

is not limited to discrete individuals but is borne by the entire population of the state. Given the scope and size of the class, joinder of individual plaintiffs is neither feasible nor efficient.

32. There are questions of law and fact common to the class that predominate over any individual issues. These include, but are not limited to:

    a. Whether Defendants' policy or practice of permitting ICE officers to operate without identification violates the First Amendment by obstructing the right to petition the government for redress of grievances;

    b. Whether the policy violates the Fifth Amendment by depriving citizens of procedural and substantive due process;

    c. Whether the policy violates the Fourth Amendment by permitting unreasonable seizures; and

    d. Whether the policy violates the Administrative Procedure Act as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

33. These questions are not unique to individual plaintiffs but apply equally to every class member. The claims arise from a single course of conduct—the systemic anonymity of ICE officers in Wisconsin—and are capable of

resolution through common proof. The relief sought, both declaratory and injunctive, will address the rights of all class members at once.

34. Plaintiff's claims are typical of the claims of the class. Plaintiff has been, and remains, subject to the same risk of injury as every other class member: the possibility of encounters with ICE officers who conceal their identity and thereby deprive citizens of constitutional protections. Plaintiff's claims arise from the same policies and practices that apply uniformly across the class, and his legal theories mirror those advanced on behalf of all class members.

35. Plaintiff will fairly and adequately protect the interests of the class. He has no conflicts of interest with other class members and has retained experienced counsel who are well-versed in federal civil rights litigation, constitutional law, and class action practice. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the class.

36. Defendants have acted, and continue to act, on grounds generally applicable to the class. Their policy or practice of permitting ICE officers to conceal their identity affects all members of the proposed class, not just Plaintiff. As such, final injunctive and declaratory relief is appropriate for the class as a whole under Rule 23(b)(2).

37. A class action is superior to other methods of adjudicating this controversy. Individual lawsuits would be impractical, inefficient, and risk inconsistent

results. Because the relief sought is indivisible, requiring systemic changes to ICE's enforcement practices, a class-wide judgment is the only means of providing comprehensive relief. Class certification will ensure consistent adjudication, conserve judicial resources, and protect the constitutional rights of all Wisconsin citizens.

38. For these reasons, Plaintiff respectfully requests that the Court certify this case as a class action under Federal Rule of Civil Procedure 23, appoint him as class representative, and appoint his counsel as class counsel.

## **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

39. Bangstad is an outspoken political advocate who has consistently exercised his rights under the First Amendment to the United States Constitution. Bangstad owns and operates the Minocqua Brewing Company (MBC), a craft brewery with two taprooms in Wisconsin. Bangstad uses MBC as both a business and a platform for political expression.

40. At his taprooms, Bangstad regularly engages the public by serving politically themed beer, offering progressive merchandise, and political rallies that combine community gathering with political advocacy. During these events, he discusses politics, critiques local and national officials, encourages civic participation, and highlights the work of his affiliated

SuperPAC. These assemblies are designed to inspire attendees to become more involved in civic life and to hold government accountable through lawful political action.

41. Bangstad's advocacy extends far beyond his craft brewery. He is an active participant in political discourse through social media, publications, signage, radio appearances, and public commentary. He consistently supports or opposes candidates for office, criticizes government policies and officials by name, and uses his platforms to influence and inform public debate on issues of national and local importance.

42. Bangstad organizes political activity through his SuperPAC, which he has used to advance progressive causes, to support or oppose candidates, and to challenge government policies he believes are unlawful or unjust. Among his efforts, he filed a formal complaint with the Wisconsin Elections Commission seeking to disqualify former President Trump from the ballot, and he has frequently directed public criticism at elected officials and agencies whose actions he believes threaten democratic governance.

43. Through these activities, Bangstad has become a visible and influential political figure in Wisconsin. He regularly speaks to audiences numbering in the hundreds of thousands through his online platforms, including Facebook and Substack. His advocacy is rooted in the ability to identify specific

government actors, call out their misconduct, and mobilize the public in response, activities that lie at the core of the freedoms protected by the First Amendment.

44. Bangstad also relies on the ability to use specific incidents in his public commentary, whether at political rallies, through publications, or on social media platforms. Anonymous enforcement actions strip these events of the detail necessary to inform the public and to channel community response into petitions, complaints, and political advocacy.

45. Because ICE conducts operations without names or identifiers, Bangstad cannot petition the government to redress grievances against the individual officers involved. While he seeks to publicize the conduct of those officers, their anonymity makes it impossible for the community to direct its speech and petitioning efforts toward those actually responsible.

46. Members of the public who follow Bangstad's advocacy or attend his events often look to him to explain government actions and to identify the officials behind them. ICE's policy of permitting officers to act without identification leaves him unable to fulfill this role. The anonymity of those exercising federal power not only denies him the ability to direct his own grievances but also undermines his ability to equip others with the knowledge necessary to participate meaningfully in civic life.

47. The concealment of officer identities therefore obstructs Bangstad's ability to exercise his First Amendment rights in the manner he has long practiced—by calling out specific officials, demanding accountability, and encouraging others to petition their government. Without the ability to identify those responsible for ICE's conduct in Wisconsin, Bangstad's speech loses force, his petitions lose focus, and his audience is left without a clear path to redress.

48. Over the last six months, ICE has shifted heavily toward a "raid" style of civil immigration arrest, deploying teams of officers in full tactical gear into residential neighborhoods, workplaces, and public spaces. According to reporting, the agency's daily arrest targets have surged by more than two hundred percent compared with the same period last year, with some weeks averaging close to one thousand arrests a day. These operations look less like civil enforcement of immigration law and more like paramilitary raids, carried out by masked officers dressed in body armor and carrying long guns

49. ICE's own detention statistics confirm that the overwhelming majority of those arrested in these raids are not violent criminals but individuals accused only of civil immigration violations. As of July 2025, more than seventy percent of people in ICE custody had no criminal convictions at all, and over ninety percent had no violent offenses. Yet officers arrive as if they are

storming Fallujah, using tactics meant for combat zones while detaining elderly men, women, and children. This practice exposes communities to fear and confusion, further eroding the distinction between civil enforcement and military action and heightening the constitutional harms at issue in this complaint.

50. To sustain this surge, ICE has received billions in new funding and has doubled down on recruitment and militarized training. New officers are promised signing bonuses and student loan forgiveness while being trained not just in immigration law but in weapons and tactical operations. The emphasis on tactical readiness over transparency has created an environment where masked and unidentified officers conduct sweeping raids in American cities and towns. In a constitutional democracy, civil enforcement actions should not be indistinguishable from military operations, and the lack of identifiable insignia compounds the risk of unlawful seizures and impersonation.

51. U.S. Immigration and Customs Enforcement ("ICE") routinely permits, and in many cases encourages or mandates, its officers to conduct enforcement operations such as detentions, searches, and arrests without visible insignia, badges, or name tags. Moreover, ICE officers are often masked or otherwise concealing their identity while acting in their official capacity.    This is

deliberate, and the result of ICE policies and procedures promulgated by Defendants.

52. ICE officers frequently wear tactical gear bearing only generic labels such as "Police" or "Federal Agent," with no identifying agency marks, unit information, or officer names. Many also don face coverings—ballistic masks, balaclavas, helmets—that fully obscure identity. This creates profound confusion for citizens encountering such individuals who may not know whether they are legitimate federal agents or criminal impersonators.

53. ICE enforces civil immigration violations not criminal offenses, and it does so within communities. The agency is not conducting military operations in foreign combat zones. Yet its officers often appear dressed as if they were conducting combat operations in Iraq. They arrive in armored vehicles, armed with rifles, in full tactical gear, while the people subjected to these extreme shows of force are often women, children, the elderly, and other nonthreatening individuals.

54. This enforcement posture undermines First Amendment protections. When citizens cannot identify who exercises authority in their presence, they cannot meaningfully petition for redress or challenge wrongful conduct. The anonymity of masked agents quashes the right to petition by eliminating the ability to name, locate, or hold accountable the offending party.

55. Similarly, Fourth Amendment protections depend on scrutiny of government actions. Unreasonable searches and seizures become effectively unchallengeable when the acting officer remains anonymous. Without identification, there is no meaningful way for affected individuals or the judiciary to determine whether probable cause existed, whether the force used was excessive, or whether the actor even had legal authority.

56. Fifth Amendment due process requires notice and an opportunity to be heard. This foundational right vanishes when agents conceal their identity. Citizens cannot understand what process is being applied, who is applying it, or how to contest it. Anonymous enforcement turns due process into a blank shell.

57. Under the Administrative Procedure Act, agencies must act transparently and with reasoned deliberation. ICE's policy of permitting anonymous enforcement is arbitrary and capricious under 5 U.S.C. § 706(2)(A), as it fails to consider less restrictive alternatives and imposes widespread loss of constitutional rights without justification or review.

58. ICE's policy has predictably led to impersonations. Criminal actors exploit the lack of visible identification to pose as ICE agents, extort noncitizens, and commit armed robbery or assault. These impersonators prey on fear of deportation and public intimidation, facilitated by ICE's own operational opacity.

59. The harm from this policy is irreparable. Each anonymous encounter erodes civil liberties, chills expression, displaces democratic participation, and undermines public trust in governmental authority.

60. Wisconsin has not been immune from the aggressive tactics of ICE, or the consequences of its new policies.

61. ICE agents have been repeatedly observed operating in communities across Wisconsin while wearing masks and other face coverings that obscure their identity. Reports from Milwaukee, Madison, Green Bay, and smaller northern towns describe agents conducting enforcement actions in tactical gear, often in unmarked vehicles, without displaying insignia or nameplates. Residents encountering these masked officers cannot readily confirm whether they are legitimate federal agents or impersonators, which creates fear, confusion, and distrust.

62. ICE has engaged in enforcement practices throughout Wisconsin that have violated the constitutional rights of residents. In communities ranging from Milwaukee and Madison to Green Bay and smaller northern towns, individuals have been subjected to raids, courthouse arrests, and neighborhood operations carried out without proper notice, clear authority, or adherence to constitutional safeguards. Its actions have left families fearful,

undermined public trust in government, and eroded the rights that Wisconsin residents are guaranteed under the Constitution.

63. In Walworth County on July 15, 2025, Court Commissioner Peter Navis asked to see an ICE warrant before allowing a detainee to be removed from his courtroom. A local prosecutor disputed his authority to demand one; federal officers returned and conducted a second arrest shortly afterward. Navis was later forced out of his position as Court Commissioner.

64. In 2025, ICE began making arrests at the Milwaukee County Courthouse, including in family court areas used by children.  In April 2025, when federal authorities arrested Milwaukee Circuit Judge Hannah Dugan on obstruction charges related to an immigration activity.

65. In February 2025, a man was charged in suburban New Berlin with impersonating a Border Patrol agent on multiple occasions.

66. In rural communities near Wausau and Rhinelander, families reported masked people in unmarked vehicles conducting surveillance of homes and barns, claiming ICE authority.

67. Nationwide, ICE's anonymous enforcement approach has led to widespread impersonation attempts. In Texas, armed individuals wearing tactical gear falsely claimed to be ICE agents.

68. In New Jersey, immigrant businesses were targeted by individuals posing as ICE agents, demanding bribes in exchange for "protection" from raids. These acts were facilitated by ICE's failure to require easily verifiable identification, creating an environment where impersonators thrive.

69. In New York City, incidents occurred in which residents were approached by masked individuals claiming ICE authority; victims complied out of fear but were later robbed.

70. In Illinois, impostors have posed as ICE agents and conducted vehicle stops to harass day laborers.

71. The incidents in Wisconsin and nationally are not random. They are predictable results of ICE's policy to operate in ways that obfuscate identity. By refusing to require visible identification, the agency fosters conditions where impersonators can prey on average citizens.

72. Additionally, the widespread use of military style gear for enforcement of civil violations conveys a perception of danger not supported by enforcement objectives, especially when applied to nonviolent and vulnerable populations. This disconnect contributes to ambient fear, dissuades civic engagement, and destabilizes public trust in government.

73. The harm caused by ICE's policies are immeasurable and extend throughout society. When officers appear masked and without insignia, no one can know

with certainty whether they are legitimate law enforcement or criminals exploiting the appearance of authority. Individuals cannot rationally decide how to respond, whether to comply, contest, or seek redress, when the identity and authority of the actor are concealed. Communities cannot speak, protest, petition, assemble, or vote with confidence when those who wield government power present themselves in ways indistinguishable from impersonators.

74. Under the APA, ICE's failure to implement basic identification requirements is arbitrary, capricious, and in violation of its duty to act transparently. Citizens lack means to determine who represents the government and how to seek remedy. That abdication warrants judicial intervention to command adherence to constitutional and statutory norms.

75. Enforcement has created a dual threat: anonymous agents whom citizens cannot challenge and impersonators who exploit that anonymity for criminal purposes. This duality erodes the First Amendment right to petition, the Fourth Amendment right to be secure against unreasonable seizures, the Fifth Amendment guarantee of due process, and the APA's requirement for rational, transparent administration.

76. Wisconsin residents have firsthand lived the consequences, courthouse arrests, impersonations, civic confusion, and fear-driven disengagement from public life and democratic processes.

77.. ICE has carried out raids on restaurants and bars across the United States, frequently without warrants supported by probable cause. These operations often rely on unverified tips or sweeping suspicion rather than individualized findings, and agents routinely enter businesses during operating hours, disrupting service and intimidating both workers and patrons. In many of these cases, agents leave without locating undocumented immigrants, underscoring the arbitrary and fear-driven nature of the raids. Businesses are left with lost revenue, frightened employees, and shaken customers, but little or no evidence of unlawful conduct is uncovered.

78. The arbitrary nature of these restaurant and bar raids highlights a systemic practice that threatens lawful establishments regardless of their operations or clientele. Such raids treat public gathering spaces as potential targets, even where no probable cause exists, blurring the line between legitimate enforcement and intimidation. The result is an environment in which any restaurant or bar may be subjected to an ICE raid at any time, regardless of whether immigration violations are present.

79. Plaintiff Bangstad owns and operates two taprooms in Wisconsin that serve politically themed beer and function as gathering places for political discussion and community activity. Because ICE has targeted restaurants and bars across the country, including in Wisconsin, Bangstad's businesses face a

realistic risk of being subjected to the same tactics. The prospect of armed federal agents entering his taprooms without probable cause, detaining staff or customers, and disrupting events is not hypothetical but consistent with ICE's established practice.

80. The risk of such a raid carries unique consequences for Bangstad given the political nature of his taprooms. His establishments are not only businesses but also forums for public speech, rallies, and advocacy. An ICE raid conducted without probable cause would not only harm his staff and customers but would also chill the expressive activity that occurs there, silencing political speech and discouraging civic participation. By conducting arbitrary operations in restaurants and bars nationwide, and in Wisconsin specifically, ICE has created an environment of uncertainty and intimidation that directly threatens Bangstad's businesses and the expressive activity they foster.

81. The Harms caused by masked ICE agents are not remediable through individual lawsuits because anonymity prevents identification of actors and obscures the factual basis necessary for redress. Only class-wide injunctive and declaratory remedies can address these systemic failures

82. Plaintiff and the proposed class seek court-ordered relief that compels ICE and DHS to require visible identification of officers in all public enforcement

operations, refrain from anonymity except in narrowly justified and documented circumstances, and establish procedures for transparency, oversight, and community protections.

## CLAIMS FOR RELIEF

### First Claim for Relief
### First Amendment: Right to Petition
### (Against All Defendants)

83. Plaintiff incorporates and realleges the allegations set forth in paragraphs 1 through 82 as if fully set forth herein.

84. The First Amendment to the United States Constitution declares that *"Congress shall make no law... abridging the freedom of speech... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."* This language is plain and absolute. It establishes the Petition Clause as an essential mechanism by which citizens hold their government accountable. The right to petition ensures that individuals are not silenced or rendered powerless in the face of government authority, but instead may direct grievances, seek remedies, and demand accountability through lawful channels.

85. The Petition Clause operates hand in hand with the freedoms of speech and association. Citizens must be able to communicate grievances, assemble collectively if they choose, and direct their complaints to a known branch or

officer of government. Without identification of the official involved, the right to petition becomes hollow. It is the ability to name, describe, and challenge a government actor that transforms grievances from private frustration into actionable constitutional claims.

86. Defendants' policy or practice of permitting ICE officers to operate in public without visible identification strips citizens of this foundational right. Officers engage in detentions, arrests, questioning, and searches without wearing badges, nameplates, or other markings that reveal who they are. Citizens encountering such officers cannot distinguish legitimate federal officials from imposters, nor can they later determine who performed the enforcement action against them.

87. The absence of identification is not a minor technicality. Identification is the essential thread that connects the citizen's experience of government power to the accountability mechanisms of courts, agencies, and oversight bodies. When that thread is cut, the ability to petition is lost. A person detained by an officer who refuses to identify himself cannot later direct a grievance to a supervisor, cannot file a complaint with specificity, and cannot meaningfully pursue relief in court because they cannot know who preformed the act.

88. The chilling effect of this policy is immediate. A citizen subjected to anonymous authority is not only deprived of accountability after the fact but

also deterred from speaking, recording, or protesting in the moment. Citizens hesitate to exercise their rights when they do not know who is wielding the badge and cannot be sure whether accountability exists at all. The Petition Clause guarantees that the act of seeking redress is real, not illusory. Defendants' policy undermines that guarantee by ensuring that grievances cannot be tied to any identifiable actor.

89. The First Amendment does not tolerate government practices that discourage or deter the exercise of petitioning rights. The right to petition, like the freedoms of speech and press, is judged not only by whether individuals are silenced outright but also by whether government actions burden, chill, or obstruct their ability to speak out and seek redress. By making officers unidentifiable, Defendants have erected a barrier that citizens cannot overcome. Petitioning against an anonymous officer is a meaningless exercise. The right exists on paper but vanishes in practice.

90. The harm caused by this policy is not speculative. Every time an ICE officer engages in public enforcement without visible identification, citizens are deprived of the ability to pursue immediate complaints. For those arrested or detained, the harm is compounded because they cannot direct legal counsel or oversight bodies to the specific officer who acted against them. For bystanders or community members who witness misconduct, the harm is

equally severe. They cannot credibly report abuse, file affidavits, or provide testimony when the officer's identity has been concealed.

91. The First Amendment requires more than the theoretical availability of petition. It requires that petitioning be practicable and meaningful. Without identification, citizens cannot name the wrongdoer, cannot pursue grievances with precision, and cannot ensure that misconduct is reviewed or corrected. The Petition Clause exists to prevent such futility.

92. Plaintiff Bangstad is a Wisconsin resident who actively exercises his First Amendment rights by speaking on matters of public concern, criticizing government officials, and encouraging civic participation. He does so through regular rallies held at the Minocqua Brewing Company Taproom, through publications and signage, and through online platforms that reach audiences in the tens of thousands.

93. Bangstad's advocacy depends on the ability to identify government officials responsible for particular actions so that he may direct criticism at them, document their conduct, and encourage his audience to hold them accountable. His political speech includes identifying officials by name, describing their actions in detail, and urging the public to respond through lawful petition and civic engagement.

94. ICE's policy of allowing its officers to conduct enforcement operations while masked and devoid of identifying insignia prevents Bangstad from engaging in this form of core political speech. When armed federal officers act anonymously, Plaintiff cannot identify those responsible for particular enforcement actions and therefore cannot direct grievances at them or encourage his audience to do so.

95. This concealment strips Plaintiff's speech of its force and effectiveness. He cannot highlight the misconduct of particular officers and is deprived of the necessary information to submit petitions or complaints, and cannot transform incidents of government abuse into focused political advocacy. Instead, his commentary is reduced to generalities, depriving his audience of the ability to seek meaningful accountability.

96. Members of the public who attend Bangstad's rallies or follow his publications look to him to explain government actions and to identify those responsible. ICE's anonymity policy leaves him unable to provide this information, obstructing both his speech and the ability of the community to act on it.

97. Plaintiff also engages in political litigation as part of his broader advocacy. He has initiated or supported lawsuits and formal complaints to challenge unlawful government actions, to contest the eligibility of candidates for

public office, and to demand compliance with constitutional and statutory requirements. Litigation is one of the primary tools through which Plaintiff seeks accountability from public officials and agencies.

98. The ability to pursue such litigation depends on knowing who is responsible for the government action at issue. When ICE officers carry out enforcement operations while masked and devoid of identifying insignia, Plaintiff cannot determine the identity of those officers or gather the information necessary to bring focused legal claims against them.

99. This concealment obstructs Plaintiff's ability to convert instances of government misconduct into actionable cases in court. Anonymous enforcement deprives him of standing facts, prevents him from naming defendants, and frustrates his ability to marshal evidence for claims of unconstitutional conduct. As a result, Plaintiff is denied access to one of the core mechanisms the First Amendment protects: the ability to petition the government for redress of grievances through the courts.

100. Defendants' policy therefore not only chills Plaintiff's speech but also obstructs his use of litigation as a form of petitioning activity. By preventing him from identifying the individual officers responsible for enforcement actions, the policy undermines his ability to bring suits, file complaints, or otherwise pursue judicial remedies.

101.    Defendants' policy of permitting ICE officers to conduct civil enforcement actions while masked and without identifying insignia therefore violates the First Amendment to the United States Constitution and has injured Plaintiff by abridging right to petition the government for a redress of grievances, obstructing accountability, and inflicting immediate and irreparable harm on his ability to engage in protected political speech.

102.    Defendants may argue that anonymity protects officer safety. But constitutional rights cannot be sacrificed to administrative convenience or speculative fears. The government may not extinguish fundamental rights under the guise of efficiency or generalized security concerns. If officer safety requires certain precautions, those precautions must be narrowly tailored. That means adopting measures that protect safety while still ensuring accountability, not imposing blanket anonymity that erases the public's ability to petition altogether.

103.    The Courts only permit restrictions on fundamental rights only where they serve a compelling governmental interest and are designed in the least restrictive way possible. Defendants' policy is not tailored at all. It is sweeping and categorical. It conceals all officers in all situations, regardless of whether safety is at risk, regardless of whether there are less restrictive alternatives available, and regardless of the harm to citizens' rights.

104.     The denial of the right to petition is not a temporary inconvenience but an ongoing injury. Citizens subjected to anonymous enforcement are permanently deprived of the chance to identify who acted against them. Once that opportunity is lost, it cannot be recovered. The passage of time, the erosion of memory, and the absence of records ensure that the harm is permanent.

105.      Violations of the First Amendment constitute irreparable harm as a matter of law. Courts have long recognized that the loss of First Amendment freedoms, even for short periods, is an injury that cannot be compensated by money damages. The right to petition is not fungible or replaceable. Once silenced or obstructed, the injury is complete. Injunctive and declaratory relief are therefore the only adequate remedies.

106.     Plaintiff brings this claim seeking declaratory as well as preliminary and permanent injunctive relief.

107.     Plaintiff also requests this court grant him reasonable costs of the action, court costs, and attorneys' fees; and such other and further relief as the Court may deem just, proper, and appropriate.

**Second Claim for Relief**
**Fifth Amendment: Due Process**
**(Against All Defendants)**

108.    Plaintiff incorporates and realleges the allegations set forth in

paragraphs 1 through 107 as if fully set forth herein.

109.    The Fifth Amendment to the United States Constitution declares that

*"No person shall... be deprived of life, liberty, or property, without due*

*process of law."* U.S. Const. Amend. V. The Due Process Clause serves as

one of the most important checks on arbitrary government action, protecting

individuals from the exercise of power untethered to fairness, transparency,

and accountability. It has both procedural and substantive dimensions.

Procedural due process ensures that when government seeks to deprive a

person of liberty, the deprivation occurs only after fair procedures are

followed. Substantive due process ensures that government does not wield

its authority in ways that are arbitrary, oppressive, or unrelated to legitimate

governmental purposes.

110.    Defendants' policy or practice of permitting ICE officers to operate in

public without visible identification violates both the procedural and

substantive guarantees of the Fifth Amendment. It strips citizens of the

minimum safeguards required to contest the exercise of government

authority over them and allows federal agents to wield coercive power

without transparency or accountability.

111.     Procedural due process begins with notice. A person cannot effectively contest government action if they do not know who is acting against them. Identification of government officials performing arrests, searches, or detentions is the most basic form of notice. Without it, the target of enforcement is unable to prepare a defense, challenge the legality of the action, or even determine whether the person purporting to be a government officer is in fact a legitimate official. The practice of anonymity erases this threshold safeguard.

112.     Procedural due process also requires the opportunity to be heard. A hearing, whether administrative or judicial, is only meaningful if the individual can identify the officer whose conduct is at issue. Otherwise, the proceeding becomes abstract and toothless, devoid of the factual basis necessary to determine what occurred and whether government action complied with constitutional and statutory requirements. Citizens cannot testify credibly, present evidence, or cross-examine witnesses if the government agent remains hidden behind anonymity.

113.     Defendants' policy of anonymity compounds these procedural harms by ensuring that records of enforcement actions cannot be traced to individual officers. Complaints submitted to oversight bodies are met with bureaucratic opacity, as agencies cannot or will not identify the agent

involved. The result is a procedural dead end: citizens are deprived of notice, deprived of a meaningful hearing, and deprived of any realistic ability to challenge government misconduct.

114.    The Due Process Clause does not merely guarantee the right to a formal process. It requires a process that is real, substantive, and fair. Anonymous enforcement actions do not meet this standard. They reduce due process to a hollow ritual in which citizens are asked to trust a faceless authority they cannot confront, identify, or hold accountable.

115.    The practice of anonymity also violates substantive due process. The government may not exercise coercive power in ways that are arbitrary, abusive, or divorced from legitimate governmental purposes. Government agents wield enormous authority when they detain, search, or arrest individuals. That authority must be exercised transparently and with accountability, lest it devolve into tyranny. By permitting officers to act without identification, Defendants sanction a practice that is arbitrary on its face and devoid of a legitimate governmental purpose.

116.    Substantive due process also guards against punitive conditions of government action that lack a legitimate governmental purpose. When officers act anonymously, the effect is punitive. Citizens experience enforcement as an exercise of unchecked power, shrouded in secrecy and

fear. This secrecy is not designed to serve a legitimate purpose but to shield government actors from accountability. That is punitive in nature and violates substantive due process.

117.    The anonymity policy has resulted in repeated violations of the Fifth Amendment's guarantee of due process for members of the proposed class. Class members have been detained during early-morning operations by ICE officers who refused to state their names or display identifying insignia. They were not informed of the grounds for their arrest, were not presented with warrants, and were denied even the most basic notice of rights or procedures. Class members were taken from their homes without explanation, leaving their families unable to locate them or pursue legal remedies in the immediate aftermath.

118.    Class members have also been seized during workplace raids in which ICE officers provided no notice of charges, no documentation, and no opportunity to contest the legality of the arrest. These members were deprived of liberty at the hands of anonymous officers, unable to petition the government for redress or to seek judicial review of their detentions. The secrecy surrounding such arrests created arbitrary deprivations of liberty and stripped members of the proposed class of the procedural safeguards the Fifth Amendment requires.

119.    The injuries inflicted by Defendants' policy are systemic. Every citizen of Wisconsin, regardless of immigration status, is subject to potential encounters with unidentified ICE officers. The harms are uniform: deprivation of notice, deprivation of a meaningful opportunity to be heard, and exposure to arbitrary and punitive government action. Because the policy applies across the board, declaratory and injunctive relief are the appropriate remedies. Such relief ensures that constitutional protections are enforced not just for individual plaintiffs but for all members of the proposed class.

120.    Without an injunction, Defendants will continue to permit officers to act anonymously, and citizens will continue to suffer irreparable harm. The deprivation of due process rights cannot be remedied after the fact. Once a person has been detained or arrested by an anonymous officer, the opportunity to know who acted against them is permanently lost. That harm is not compensable by damages. It is irreparable as a matter of law.

121.    The systemic nature of the harm also underscores the appropriateness of class-wide injunctive relief. Courts have repeatedly recognized that systemic violations of due process require systemic remedies.

122.    The harm to citizens from the denial of due process is irreparable. Courts have long held that constitutional violations, particularly those

involving liberty, cannot be undone with monetary awards. Once liberty has been taken without due process, the injury is complete. An injunction is the only adequate remedy.

123.    Plaintiff and the proposed class therefore seek declaratory and injunctive relief requiring Defendants to immediately cease the practice of allowing ICE officers to operate without identification. Officers must be required to display visible identification, disclose their identity upon request, and refrain from concealing their identity absent compelling and narrowly tailored circumstances.

124.    Without such relief, the harms will continue. Citizens will remain unable to identify the government agents acting against them. They will remain unable to pursue meaningful hearings or challenge arbitrary detentions. They will remain exposed to punitive and arbitrary conditions of enforcement without recourse. This Court has the power and the duty to prevent such ongoing constitutional violations.

125.    Accordingly, Defendants' policy or practice of allowing ICE officers to operate without identification violates the Due Process Clause of the Fifth Amendment. It deprives citizens of notice, the opportunity to be heard, and protection against arbitrary and punitive government action. It inflicts irreparable harm that cannot be remedied by damages. Plaintiff and the

proposed class respectfully request that this Court declare the policy

unconstitutional and enjoin Defendants from continuing the practice.

126.    Plaintiff brings this claim seeking declaratory as well as preliminary

and permanent injunctive relief.

127.    Plaintiff also requests this court grant him reasonable costs of the

action, court costs, and attorneys' fees; and such other and further relief as the

Court may deem just, proper, and appropriate.

### Third Claim for Relief
### Fourth Amendment: Unreasonable Seizures
### (Against All Defendants)

128.    Plaintiff incorporates and realleges the allegations set forth in

paragraphs 1 through 99 as if fully set forth herein.

129.    The Fourth Amendment to the United States Constitution provides

that *"The right of the people to be secure in their persons, houses, papers,*

*and effects, against unreasonable searches and seizures, shall not be*

*violated, and no Warrants shall issue, but upon probable cause, supported*

*by Oath or affirmation, and particularly describing the place to be searched,*

*and the persons or things to be seized."* U.S. Const. Amend. IV. This

Amendment stands as a central bulwark against arbitrary exercises of

government power. It guarantees that detentions, arrests, and searches will

-43-

be based on lawful authority, supported by probable cause, and carried out in a manner consistent with constitutional standards.

130.    The protection against unreasonable searches and seizures is not limited to formal arrests. It extends to every encounter where a government official restrains liberty or intrudes upon privacy, including investigative stops, questioning, and detentions in public. It also extends to seizures conducted by federal immigration officers such as those employed by ICE.

131.    Defendants' policy or practice of permitting ICE officers to act without identification violates the Fourth Amendment in several interrelated ways. First, it removes accountability from encounters that implicate core constitutional rights. Second, it allows seizures to occur without the transparency necessary to verify that probable cause existed. Third, it fosters systemic practices where unreasonable seizures are effectively insulated from challenge, since the identity of the officer who conducted the seizure is concealed.

132.    When ICE officers stop, question, or detain individuals in Wisconsin without badges or identifying insignia, those individuals are deprived of the ability to confirm whether the encounter was lawful. The inability to identify an officer makes it impossible to trace the source of authority, to determine

whether the officer had probable cause or reasonable suspicion, or to challenge the seizure through judicial or administrative mechanisms.

133.    This anonymity directly undermines the central purpose of the Fourth Amendment: to protect individuals from arbitrary government power. The Amendment's safeguards are meaningful only if citizens can challenge unlawful seizures. That challenge requires knowing who carried out the act. Without identification, accountability disappears, and the government's burden to justify the seizure evaporates in practice.

134.    The policy of anonymity also creates conditions where seizures become inherently unreasonable. The Fourth Amendment does not tolerate secret enforcement carried out by faceless officials. When the identity of an officer is concealed, there is no way for the public, the courts, or even oversight agencies to determine whether constitutional limits have been observed. A seizure conducted by an unidentified officer is unreasonable on its face, because it strips the citizen of the opportunity to verify its lawfulness.

135.    These harms are systemic. Every person in Wisconsin is subject to possible encounters with unidentified ICE officers. The policy does not target a limited group or apply only in exceptional cases. It is broad,

categorical, and ongoing. The risk of unreasonable seizure is borne equally
by all members of the proposed class.

136.    The Fourth Amendment requires probable cause or, in limited cases,
reasonable suspicion for a seizure. But when officers conceal their identity,
citizens cannot meaningfully contest whether probable cause existed. For
example, in a challenge to an unlawful detention, the plaintiff must
ordinarily identify the officer, depose them, and obtain evidence regarding
the basis for the detention. Anonymity prevents that process from occurring.
Without the ability to trace the seizure to a particular officer, challenges
cannot be made, and unlawful seizures proliferate unchecked.

137.    The harm is not hypothetical. ICE has engaged in systemic practices
across the country that have led to unlawful seizures, including detainers
issued based on unreliable databases and arrests made without sufficient
individualized suspicion. Defendants' anonymity policy compounds these
systemic problems by shielding officers from scrutiny and preventing courts
from evaluating the constitutionality of their actions.

138.    The practice also creates conditions ripe for abuse. When officers
know they will not be identifiable, they face little deterrent against
unconstitutional conduct. The absence of identification emboldens
misconduct by ensuring that accountability is nearly impossible. The Fourth

Amendment demands not only that seizures be justified by probable cause but also that government practices create conditions where compliance with constitutional standards is monitored and enforced.

139.    Members of the proposed class have already suffered injuries as a result of ICE officers carrying out raid-style arrests without visible identification or lawful warrants. Residents have described officers arriving in unmarked vehicles, surrounding homes, and detaining individuals without ever producing warrants or identifying themselves as federal agents. Families have been forced to open their doors under threat of armed officers without confirmation that those outside were lawful government actors, and individuals have been seized in the presence of children without probable cause.

140.    Community members have further reported that ICE officers regularly enter public spaces, question residents, and detain individuals without presenting judicially authorized warrants. Those detained cannot verify who is exercising government authority over them or on what basis, making the seizures unreasonable under the Fourth Amendment. Class members are deprived of their right to challenge the legitimacy of the encounter in real time and are left traumatized by the appearance of masked, heavily armed men who refuse to disclose their identities.

141.    Declaratory and injunctive relief are necessary to address these systemic violations. Declaratory relief will establish that Defendants' anonymity policy violates the Fourth Amendment by allowing unreasonable seizures to occur without accountability. Injunctive relief will ensure that officers are required to wear visible identification and provide their names or badge numbers upon request. Only by restoring transparency can the Court guarantee that the protections of the Fourth Amendment are meaningful in practice.

142.    Irreparable harm flows directly from these constitutional violations. Once a person has been seized by an anonymous officer, the injury is complete and cannot be remedied after the fact. The opportunity to challenge the seizure, to hold the officer accountable, and to obtain meaningful relief is lost forever. Courts have recognized that violations of constitutional rights, and particularly violations of the Fourth Amendment, constitute irreparable harm for which damages are inadequate. Injunctive and declaratory relief are therefore required.

143.    Class-wide relief is also appropriate. Defendants' policy is uniform, affecting all potential class members equally.

144.    Without this relief, the violations will persist. Citizens will continue to be subjected to seizures by unidentified officers, unable to verify the

lawfulness of those encounters, and unable to hold officers accountable for

misconduct. The protections of the Fourth Amendment will remain illusory,

and constitutional injuries will continue to accrue.

145.    Accordingly, Defendants' policy or practice of allowing ICE officers

to operate without identification violates the Fourth Amendment to the

United States Constitution. It permits unreasonable seizures, prevents

accountability, and causes irreparable harm to the members of the proposed

class. Plaintiff and the class respectfully request that this Court declare the

policy unconstitutional and enjoin Defendants from continuing the practice.

146.    Plaintiff brings this claim seeking declaratory as well as preliminary

and permanent injunctive relief.

147.    Plaintiff also requests this court grant him reasonable costs of the

action, court costs, and attorneys' fees; and such other and further relief as the

Court may deem just, proper, and appropriate.

## Fourth Claim for Relief
### Violation of Administrative Procedure Act
### (Against All Defendants)

148.    Plaintiff incorporates and realleges the allegations set forth in

paragraphs 1 through 147 as if fully set forth herein.

149.    The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq.,

provides the framework for ensuring that federal agencies exercise their

authority lawfully, rationally, and with accountability to the public. It establishes procedural and substantive requirements governing agency rulemaking, adjudication, and enforcement, and mandates that all agency action must not be arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

150.    The APA codifies a central principle of administrative law: agencies may not impose binding rules or systemic practices without transparency, standards, and accountability. When agencies disregard these requirements, the APA empowers courts to review and set aside unlawful actions. See 5 U.S.C. §§ 701–706.

151.    Defendants' policy and practice of permitting ICE officers to conduct enforcement operations while masked and devoid of identifying insignia constitutes "agency action" within the meaning of the APA. It is a systemic enforcement practice established or authorized by the Department of Homeland Security and ICE, with ongoing legal and practical consequences for residents of Wisconsin. The policy therefore falls squarely within the APA's provisions for judicial review.

152.    The ICE policy was implemented without adhering to the mandatory notice-and-comment rulemaking procedures required by the APA. Section 553 of the APA prescribes a three-step procedure for notice-and-comment

rulemaking: (1) the agency must issue a general notice of proposed rulemaking, ordinarily by publication in the Federal Register; (2) the agency must give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments; and (3) when the agency promulgates the final rule, it must include in the rule's text a concise general statement of its basis and purpose. Rules issued through this process "have the force and effect of law."

153.     The ICE policy at issue was implemented without any notice in the Federal Register, without providing Wisconsin residents an opportunity to comment, and without publishing a statement of basis and purpose. While certain agency actions are exempt from these requirements, including interpretive rules, general statements of policy or rules of agency organization, procedure or practice, the ICE policy does not qualify for these exemptions as it substantively affects the constitutional rights of Wisconsin residents.

154.     This agency action was contrary to the Constitution and to rights guaranteed under the First, Fourth, and Fifth Amendments. By sanctioning anonymous enforcement, Defendants have created a policy that obstructs the ability of citizens to petition their government, deprives individuals of due process, and subjects residents to unreasonable searches and seizures. The

APA requires courts to hold unlawful and set aside agency actions that are unconstitutional.

155.    The policy is also arbitrary and capricious in violation of the APA. An agency acts arbitrarily when it fails to provide a rational explanation for its conduct, ignores important aspects of the problem, or fails to consider less restrictive alternatives. Here, Defendants have offered no legitimate justification for allowing officers to operate without visible identification. General references to officer safety cannot support a blanket policy that erases accountability and strips citizens of core constitutional protections.

156.    The failure to consider obvious alternatives underscores the arbitrary nature of the policy. Defendants could have implemented limited exceptions for sensitive operations, or adopted unique but visible identifiers that protect officers while still preserving accountability. Instead, they adopted a policy of categorical anonymity that extinguishes transparency altogether.

157.    The APA also requires agencies to engage in reasoned decision making when instituting practices of general applicability. When an agency adopts a systemic policy affecting broad swaths of the public, it must articulate the basis for that policy, consider its constitutional implications, and ensure consistency with governing statutes. Defendants have not met those obligations. The anonymity policy was implemented without notice,

without public input, without explanation, and without regard to the constitutional harm it inflicts.

158.    The injury caused by this unlawful agency action is not confined to isolated encounters but is systemic and ongoing. Every Wisconsin resident faces the possibility of being stopped, questioned, or detained by an ICE officer who refuses to identify himself. The policy applies broadly, ensuring that the threat of anonymous enforcement hangs over every community in the state.

159.    The inability to confirm an officer's identity creates a lasting barrier to accountability, judicial oversight, and the ability to petition for redress. When citizens cannot know who detained them, they cannot file complaints, pursue remedies, or hold the government to account. The APA was enacted to guard against precisely this type of unchecked executive power, where secrecy replaces transparency and lawful oversight is rendered impossible.

160.    Plaintiffs have standing to challenge this agency action under the APA. The APA provides that a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

161.    The ICE policy directly affects the constitutional rights of Wisconsin residents, who are unable to identify federal officers conducting enforcement

operations and thus cannot effectively petition the government for redress of grievances or challenge potentially unlawful detentions or arrests. This Court has jurisdiction to hear this claim and may properly set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

162.    Declaratory relief is necessary to establish that Defendants' policy of officer anonymity violates the APA. A judicial declaration will confirm that DHS and ICE cannot maintain enforcement practices that are arbitrary, capricious, or inconsistent with constitutional protections. Such relief will provide clarity and guidance to both the public and the government, ensuring that enforcement activities are carried out within the limits of law.

163.    Injunctive relief is likewise necessary to remedy the ongoing violations of the APA. Once an encounter occurs with an anonymous officer, the opportunity for accountability is permanently lost. The resulting harm is irreparable and cannot be compensated through damages. Only prospective relief requiring ICE officers to display visible identification and disclose their identity during public operations can prevent these injuries.

164.    Class-wide declaratory and injunctive relief is appropriate. The anonymity policy applies uniformly to all ICE enforcement operations in Wisconsin and subjects every resident to the same deprivation of

accountability and constitutional protections. A single injunction and declaration will therefore provide necessary relief to the entire proposed class.

165.    Without judicial intervention, Defendants will continue to enforce this unlawful policy. Wisconsin residents will remain subject to encounters with anonymous officers, deprived of transparency, stripped of due process, and denied the safeguards the APA was enacted to secure.

166.    Accordingly, Defendants' policy and practice of allowing ICE officers to operate without identification constitutes unlawful agency action under the Administrative Procedure Act. It was instituted without notice-and-comment rulemaking, is arbitrary and capricious, and is contrary to constitutional rights. Plaintiff and the proposed class respectfully request that this Court declare the policy unlawful, set it aside pursuant to the APA, and enjoin Defendants from continuing the practice.

167.    Plaintiff brings this claim seeking declaratory as well as preliminary and permanent injunctive relief.

168.    Plaintiff also requests this court grant him reasonable costs of the action, court costs, and attorneys' fees; and such other and further relief as the Court may deem just, proper, and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, with the class as defined above;

2. Declare that Defendants' policy or practice of allowing ICE officers to work in public without identifying patches, wearing masks, and refusing to identify themselves violates the First Amendment to the United States Constitution;

3. Declare that Defendants' policy or practice of allowing ICE officers to work in public without identifying patches, wearing masks, and refusing to identify themselves violates the Fifth Amendment to the United States Constitution;

4. Declare that Defendants' policy or practice of allowing ICE officers to work in public without identifying patches, wearing masks, and refusing to identify themselves violates the Fourth Amendment to the United States Constitution;

5. Declare that Defendants' policy or practice of allowing ICE officers to work in public without identifying patches, wearing masks, and refusing to identify themselves violates the Administrative Procedure Act;

6. Issue a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 requiring Defendants to immediately implement and enforce a policy requiring all ICE officers working in public in Wisconsin to wear clearly visible identifying information, refrain from wearing masks that obscure their identity except when medically necessary, and identify themselves when interacting with the public, pending final resolution of this case;

7. Issue a permanent injunction pursuant to Federal Rule of Civil Procedure 65 requiring Defendants to implement and enforce a policy requiring all ICE officers working in public in Wisconsin to wear clearly visible identifying information, refrain from wearing masks that obscure their identity except when medically necessary, and identify themselves when interacting with the public;

8. Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 42 USCS § 1988; and

9. Grant such other relief as the Court deems just and proper.

Dated 8/31/2025

Respectfully Submitted

*s/ Frederick Melms*

Frederick B. Melms,
Bar No. 1093957
Frederick@melmslaw.com
MELMS LAW
219 S. Main St.
Eagle River, WI 54521
Telephone:   (715) 892-3023

*Attorney for Plaintiff KIRK C. BANGSTAD*