**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| Kirk C. Bangstad,<br><br>Plaintiffs,<br><br>vs.<br><br>Todd Lyons, The Department of Homeland Security, and United States Immigration and Customs Enforcement<br><br>Defendants, | Case No. 3:25-cv-00733-jdp |

# AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff Kirk C. Bangstad, by and through his attorney of record, Frederick Melms of Melms Law, brings this Complaint for Declaratory and Injunctive Relief against Defendants Todd Lyons, The Department of Homeland Security, and United States Immigration and Customs Enforcement. Plaintiff requests that this Court certify a class consisting of all residents of Wisconsin who, since January 20, 2025, have been, or are at imminent risk of being, deprived of rights secured by the First, Fourth, and Fifth Amendments to the United States Constitution as a result of ICE's policy of conducting civil immigration enforcement operations with officers acting while masked or without visible identification, and grant declaratory and injunctive relief on behalf of that class. Plaintiff seeks a declaration that the policies of The Department of Homeland Security and United States Immigration

and Customs Enforcement which permit their officers to conduct official operations while masked and without identifying insignia is unconstitutional under the First, Fourth, and Fifth Amendments to the United States Constitution, and that the policies were adopted in violation of the Administrative Procedure Act. Plaintiff further seeks an injunction prohibiting ICE officers from conducting enforcement operations without identifying insignia and while masked.

## INTRODUCTION

1. This action arises from the unconstitutional and unlawful practices of the Department of Homeland Security ("DHS") and the United States Immigration and Customs Enforcement ("ICE") in conducting civil immigration enforcement operations in Wisconsin. ICE officers have repeatedly carried out "raid-style" arrests in residential neighborhoods and public spaces, arriving not as identifiable law enforcement but as heavily armed soldiers. They wear coyote-brown tactical gear with plate carriers, FAST helmets, combat boots, and long guns slung across their chests. Their faces are concealed behind balaclavas or masks, and their vests often lack nameplates or insignia. To the families and bystanders who witness these operations, ICE officers appear indistinguishable from masked paramilitary forces rather than public servants enforcing civil law.

2. The Constitution does not grant ICE the authority to terrorize communities through the use of military-style raids for civil immigration enforcement. Unlike combat zones such as Fallujah or Kandahar, where such tactics might be expected, ICE is not engaged in warfare. ICE is enforcing civil immigration violations, not pursuing armed insurgents. Yet its officers storm neighborhoods as though they are combatants in a foreign conflict, despite the reality that their targets are often elderly men and women, mothers with small children, or lawful residents mistakenly swept into dragnet operations.

3. These raids are particularly alarming because ICE officers conduct them without proper insignia or identification. Residents cannot discern whether the masked and heavily armed figures approaching their homes are legitimate government agents, criminal impostors, or vigilantes. This lack of accountability not only violates constitutional protections but also places the public in immediate danger, as people confronted by masked and unidentified armed men may act to defend themselves or their families.

4. The use of raid-style arrests with masked and unidentified officers has drastically increased in the last six months. Across Wisconsin, families have reported ICE officers arriving at dawn in armored vehicles, surrounding homes, and breaching doors with rifles at the ready. Witnesses describe scenes indistinguishable from military raids broadcast during wartime, except they

are happening in Milwaukee, Madison, Green Bay, and small towns across the state.

5. Plaintiff brings this action as a member of a proposed class of all Wisconsin residents who are subject to these practices. The unlawful conduct at issue does not target a single household or community but rather threatens every person in the state. When federal agents are permitted to operate masked and unidentifiable, any individual may be subjected to a raid without knowing whether those confronting them are lawful government actors or criminals exploiting ICE's tactics for their own ends.

6. The Constitution requires transparency, accountability, and lawful process from government officials who exercise coercive power.

7. The policy of ICE to permit its officers to conduct military-style raids against unarmed women, children, and elderly individuals while masked and wearing tactical gear devoid of identifying insignia violates the First Amendment because it strips citizens of their ability to petition the government for a redress of grievances. The Petition Clause guarantees not only the right to speak, but also the right to hold government officials accountable by naming them, documenting their conduct, and demanding remedies. When ICE officers intentionally conceal their identities during civil immigration operations, Wisconsin residents who suffer or witness abuses cannot know

which officer to report, cannot press for investigations of specific misconduct, and cannot pursue meaningful administrative or judicial relief. This concealment transforms the right to petition into an empty promise, causing immediate and irreparable harm by making accountability impossible in practice.

8. The policies permitting ICE to violate the Constitution on a daily basis were adopted in violation of the Administrative Procedure Act. Neither DHS nor ICE issued lawful rules, provided notice, or sought public comment before instituting militarized, raid-style operations as standard practice. Instead, ICE quietly normalized the deployment of masked and unmarked tactical units for civil arrests, despite lacking statutory authority to do so. By adopting this practice in secret, ICE acted arbitrarily and capriciously, disregarding the procedures Congress established to ensure transparency and accountability in agency action.

9. The consequences of these practices reverberate throughout Wisconsin communities. Families live in constant fear of an unexpected knock at the door in the predawn hours, never certain whether the armed men outside are legitimate federal officers or criminals exploiting the appearance of authority. Children watch masked men carrying rifles seize their parents, imprinting trauma that will remain for years. Entire neighborhoods are destabilized by

the spectacle of these raid-style operations, eroding trust in government institutions that are supposed to protect rather than terrorize.

10. As a direct result, Wisconsin residents endure a climate of fear that suppresses civic life. Parents hesitate to attend school functions, neighbors avoid community meetings, and congregants fear gathering for worship, because they cannot be sure masked and unidentified ICE officers will not descend without warning. This pervasive fear chills core First Amendment freedoms, discouraging speech, association, and the ability to petition government for redress of grievances. The constitutional injury is ongoing and irreparable, as the right to participate in civic life loses meaning when exercised under the shadow of armed and anonymous raids.

11. These policies also create fertile ground for criminal impersonation. Because ICE officers deliberately conceal their names and insignia, the public has no reliable means of distinguishing lawful officers from impostors. Bad actors can exploit this ambiguity by posing as ICE agents, gaining access to homes and families through fraud and coercion. This dangerous environment heightens the risk of kidnappings, assaults, and other crimes, compounding the harms caused by ICE's refusal to operate with transparency and accountability.

12. There is no legitimate governmental interest in terrorizing Wisconsin residents through masked, militarized tactics. Civil immigration enforcement does not require officers to wear balaclavas, plate carriers, or FAST helmets, nor does it require long guns pointed at unarmed families. If the federal government seeks to enforce civil laws, it must do so openly, lawfully, and in compliance with constitutional safeguards, not through the use of paramilitary raids that blur the line between legitimate enforcement and lawless intimidation.

13. The conduct of ICE officers shocks the conscience. In the United States, civil enforcement is not supposed to resemble military combat. The decision to outfit officers in tactical gear, conceal their identities, and descend upon neighborhoods with armored vehicles and long guns is not only unnecessary but reckless. It represents an abuse of governmental power that undermines constitutional protections and public trust.

14. The Constitution demands better. Government power must be exercised in a manner consistent with transparency, accountability, and the rule of law. The people of Wisconsin cannot be left to wonder whether the masked men with rifles outside their homes are lawful officers or criminals. This Court has both the authority and the duty to enforce the Constitution and protect the public from these unlawful practices.

15. Plaintiff and the proposed class bring this action to stop these unlawful practices. The relief sought includes declaratory and injunctive relief prohibiting ICE officers from conducting raids while masked or unidentifiable, prohibiting the use of military-style tactics in civil immigration enforcement, and requiring compliance with constitutional and statutory protections.

16. Plaintiff seeks to vindicate not only his own rights but the rights of all Wisconsin residents. Without judicial intervention, ICE will continue to expand its unconstitutional practices, normalizing paramilitary tactics in civil law enforcement, and placing all residents at risk.

17. Accordingly, Plaintiff, on behalf of himself and all similarly situated residents of Wisconsin, seeks relief to end ICE's unconstitutional policy of masked, militarized civil immigration raids, restore lawful enforcement practices, and protect the fundamental rights of all Wisconsin residents.

## PARTIES

18. Plaintiff Kirk C. Bangstad is a resident of Dane County, Wisconsin and brings this action individually and as a representative of a proposed class consisting of all residents of Wisconsin who are subject to the unlawful practices described herein.

19. Defendant United States Department of Homeland Security ("DHS") is a cabinet-level agency of the United States government headquartered in Washington, D.C. DHS is responsible for formulating and overseeing immigration enforcement policies nationwide, including those carried out within the State of Wisconsin. DHS exercises supervisory authority over its component agencies, including U.S. Immigration and Customs Enforcement.

20. Defendant U.S. Immigration and Customs Enforcement ("ICE") is a federal agency within DHS, headquartered in Washington, D.C., charged with enforcing federal immigration laws inside the United States. ICE officers operate throughout Wisconsin, including in residential neighborhoods, courthouses, schools, and workplaces. ICE is directly responsible for the raid-style enforcement actions challenged in this Complaint.

21. Defendant Todd Lyons is the Acting Director of U.S. Immigration and Customs Enforcement, who was at all times relevant to this action acting under the color of law. In his official capacity, Director Lyons is responsible for the leadership, direction, and supervision of ICE and its operations nationwide, including those within the State of Wisconsin. He is sued in his official capacity for his role in promulgating and enforcing the policies that permit ICE officers to conduct enforcement operations while masked, dressed in tactical gear, and devoid of identifying insignia.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 28 USCS § 1331, because this action arises under the Constitution of the United States, specifically the First, Fourth, and Fifth Amendments, and federal law, specifically the Administrative Procedure Act, 5 USCS § 702.

23. This Court has personal jurisdiction over Defendant Department of Homeland Security pursuant to 28 U.S.C. § 1391(e) 28 USCS § 1391, as this action is brought against a federal agency of the United States.

24. This Court has personal jurisdiction over Defendant Immigration and Customs Enforcement pursuant to 28 U.S.C. § 1391(e) 28 USCS § 1391, as this action is brought against a federal agency of the United States.

25. This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(e) 28 USCS § 1391, as Plaintiff resides in the Western District of Wisconsin, and no real property is involved in this action.

## CLASS ALLEGATIONS

26. Plaintiff brings this action on behalf of himself and all residents of Wisconsin who, since January 1, 2025, have been, or are at imminent risk of being, deprived of the rights secured to them by the First Amendment to the United States Constitution as a result of ICE's policy of conducting civil immigration enforcement operations with officers acting while masked or without visible identification to Rule 23 of the Federal Rules of Civil Procedure. Certification of the proposed class is proper because the requirements of numerosity, commonality, typicality, and adequacy are satisfied, and because the relief sought, declaratory and injunctive relief, applies uniformly to all class members.

27. The proposed class is defined as all residents of Wisconsin who, since January 1, 2025, have been, or are at imminent risk of being, deprived of the rights secured to them by the First Amendment to the United States Constitution as a result of ICE's policy of conducting civil immigration enforcement operations with officers acting while masked or without visible identification. This definition is precise, objective, and ascertainable. Each class member

shares a common exposure to the systemic policies and practices of Defendants, namely the operation of ICE officers without visible identification in public enforcement actions.

28. The class is so numerous that joinder of all members is impracticable. Wisconsin has millions of residents, each of whom is subject to potential encounters with unidentified ICE officers. The risk of constitutional violations is not limited to discrete individuals but is borne by the entire population of the state. Given the scope and size of the class, joinder of individual plaintiffs is neither feasible nor efficient.

29. There are questions of law and fact common to the class that predominate over any individual issues. These include, but are not limited to:

    a. Whether Defendants' policy or practice of permitting ICE officers to operate without identification violates the First Amendment by obstructing the right to petition the government for redress of grievances;

b. Whether the policy violates the Administrative Procedure Act as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

30. These issues are not specific to any one plaintiff. They arise from a uniform course of conduct affecting all class members, namely, the routine use of anonymous ICE officers operating within Wisconsin. Because the claims turn on that common conduct, they can be resolved through evidence that applies across the class. The declaratory and injunctive relief sought would likewise apply in a single stroke, providing relief to all class members rather than requiring individualized determinations.

31. Plaintiff's claims are typical of the claims of the class. Plaintiff has been, and remains, subject to the same risk of injury as every other class member: the possibility of encounters with ICE officers who conceal their identity and thereby deprive citizens of their constitutional right to adequately petition their government. Plaintiff's claims arise from the same policies and practices that apply uniformly across the class, and his legal theories mirror those advanced on behalf of all class members.

32. Plaintiff will fairly and adequately protect the interests of the class. He has no conflicts of interest with other class members and has retained experienced counsel who are well-versed in federal civil rights litigation, constitutional

law, and class action practice. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the class.

33. Defendants have acted, and continue to act, on grounds generally applicable to the class. Their policy or practice of permitting ICE officers to conceal their identity affects all members of the proposed class, not just Plaintiff. As such, final injunctive and declaratory relief is appropriate for the class as a whole under Rule 23(b)(2).

34. A class action is superior to other methods of adjudicating this controversy. Individual lawsuits would be impractical, inefficient, and risk inconsistent results. Because the relief sought is indivisible, requiring systemic changes to ICE's enforcement practices, a class-wide judgment is the only means of providing comprehensive relief. Class certification will ensure consistent adjudication, conserve judicial resources, and protect the constitutional rights of all Wisconsin citizens.

35. For these reasons, Plaintiff respectfully requests that the Court certify this case as a class action under Federal Rule of Civil Procedure 23, appoint him as class representative, and appoint his counsel as class counsel.

## **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

36. Bangstad is an outspoken political advocate who has consistently exercised his rights under the First Amendment to the United States Constitution. Bangstad owns and operates the Minocqua Brewing Company (MBC), a craft brewery with two taprooms in Wisconsin. Bangstad uses MBC as both a business and a platform for political expression.

37. At his taprooms, Bangstad regularly engages the public by serving politically themed beer, offering progressive merchandise, and political rallies that combine community gathering with political advocacy. During these events, he discusses politics, critiques local and national officials, encourages civic participation, and highlights the work of his affiliated SuperPAC. These assemblies are designed to inspire attendees to become more involved in civic life and to hold government accountable through lawful political action.

38. Bangstad's advocacy extends far beyond his craft brewery. He is an active participant in political discourse through social media, publications, signage, radio appearances, and public commentary. He consistently supports or opposes candidates for office, criticizes government policies and officials by name, and uses his platforms to influence and inform public debate on issues of national and local importance.

39. Bangstad organizes political activity through his SuperPAC, which he has used to advance progressive causes, to support or oppose candidates, and to challenge government policies he believes are unlawful or unjust. Among his efforts, he filed a formal complaint with the Wisconsin Elections Commission seeking to disqualify former President Trump from the ballot, and he has frequently directed public criticism at elected officials and agencies whose actions he believes threaten democratic governance.

40. Through these activities, Bangstad has become a visible and influential political figure in Wisconsin. He regularly speaks to audiences numbering in the hundreds of thousands through his online platforms, including Facebook and Substack. His advocacy is rooted in the ability to identify specific government actors, call out their misconduct, and mobilize the public in response, activities that lie at the core of the freedoms protected by the First Amendment.

41. Bangstad also relies on the ability to use specific incidents in his public commentary, whether at political rallies, through publications, or on social media platforms. Anonymous enforcement actions strip these events of the detail necessary to inform the public and to channel community response into petitions, complaints, and political advocacy.

42. By way of example, Bangstad posted on the Minocqua Brewing Company Facebook page regarding a January 2026 incident in Hudson, Wisconsin, where masked ICE agents abducted a young girl from a grocery store. The incident was objectively horrifying.

43. Although Bangstad shared a video of the incident, he was unable to identify any of the officers involved because they wore face coverings and displayed no identifying insignia.

44. The use of masks prevented Bangstad, and the public more broadly, from determining who the agents were. As a result, neither Bangstad nor other members of the public could direct criticism or protected speech toward the specific individuals involved, or call upon their supervisors or other government officials to take action in response to their despicable conduct.

45. Over the past year, Bangstad has repeatedly seen photographs and videos of ICE agents operating in Wisconsin while wearing masks and concealing identifying information. Because those agents did not display names or insignia, Bangstad has been unable to identify the individuals involved. As a result, he has not been able to direct his protests at the specific agents responsible or to call on government officials to take action against them individually.

46. When ICE conducts operations without names or identifiers, Bangstad cannot petition the government to redress grievances against the individual officers involved. While he seeks to publicize the conduct of those officers, their anonymity makes it impossible for the community to direct its speech and petitioning efforts toward those actually responsible.

47. Members of the public who follow Bangstad's advocacy or attend his events often look to him to explain government actions and to identify the officials behind them. ICE's policy of permitting officers to act without identification leaves him unable to fulfill this role.

48. The anonymity of those exercising federal power not only denies them the ability to direct their own grievances but also undermines their ability to equip others with the knowledge necessary to participate meaningfully in civic life.

49. The concealment of officer identities therefore obstructs Bangstad's ability to exercise his First Amendment rights in the manner he has long practiced; by calling out specific officials, demanding accountability, and encouraging others to do the same.

50. Without the ability to identify those responsible for ICE's conduct in Wisconsin, Bangstad's speech loses force, his petitions lose focus, and his audience is left without a clear path to redress.

51. Over the last six months, ICE has shifted heavily toward a "raid" style of civil immigration arrest, deploying teams of officers in full tactical gear into residential neighborhoods, workplaces, and public spaces. According to reports, the agency's daily arrest targets have surged by more than 200% compared with the same period last year, with some weeks averaging nearly 1,000 arrests a day. These operations look less like civil enforcement of immigration law and more like paramilitary raids, carried out by masked officers dressed in body armor and carrying long guns

52. ICE's own detention statistics confirm that the overwhelming majority of those arrested in these raids are not violent criminals but individuals accused only of civil immigration violations. As of July 2025, more than seventy percent of people in ICE custody had no criminal convictions at all, and over ninety percent had no violent offenses. Yet officers arrive as if they are storming Fallujah, using tactics meant for combat zones while detaining elderly men, women, and children. This practice exposes communities to fear and confusion, further eroding the distinction between civil enforcement and military action and heightening the constitutional harms at issue in this complaint.

53. To sustain this surge, ICE has received billions in new funding and has doubled down on recruitment and militarized training. New officers are

promised signing bonuses and student loan forgiveness while being trained not just in immigration law but in weapons and tactical operations. The emphasis on tactical readiness over transparency has created an environment where masked and unidentified officers conduct sweeping raids in American cities and towns. In a constitutional democracy, civil enforcement actions should not be indistinguishable from military operations, and the lack of identifiable insignia compounds the risk of unlawful seizures and impersonation.

54. U.S. Immigration and Customs Enforcement ("ICE") routinely permits, and in many cases encourages or mandates, its officers to conduct enforcement operations such as detentions, searches, and arrests without visible insignia, badges, or name tags. Moreover, ICE officers are often masked or otherwise concealing their identity while acting in their official capacity. This is deliberate, and the result of ICE policies and procedures promulgated by Defendants.

55. ICE officers frequently wear tactical gear bearing only generic labels such as "Police" or "Federal Agent," with no identifying agency marks, unit information, or officer names. Many also don face coverings—ballistic masks, balaclavas, helmets—that fully obscure identity. This creates profound

confusion for citizens encountering such individuals who may not know whether they are legitimate federal agents or criminal impersonators.

56. ICE enforces civil immigration violations not criminal offenses, and it does so within communities. The agency is not conducting military operations in foreign combat zones. Yet its officers often appear dressed as if they were conducting combat operations in Iraq. They arrive in armored vehicles, armed with rifles, in full tactical gear, while the people subjected to these extreme shows of force are often women, children, the elderly, and other nonthreatening individuals.

57. This enforcement posture undermines First Amendment protections. When citizens cannot identify who exercises authority in their presence, they cannot meaningfully petition for redress or challenge wrongful conduct. The anonymity of masked agents quashes the right to petition by eliminating the ability to name, locate, or hold accountable the offending party.

58. Under the Administrative Procedure Act, agencies must act transparently and with reasoned deliberation. ICE's policy of permitting anonymous enforcement is arbitrary and capricious under 5 U.S.C. § 706(2)(A), as it fails to consider less restrictive alternatives and imposes widespread loss of constitutional rights without justification or review.

59. ICE's policy has predictably led to impersonations. Criminal actors exploit the lack of visible identification to pose as ICE agents, extort noncitizens, and commit armed robbery or assault. These impersonators prey on fear of deportation and public intimidation, facilitated by ICE's own operational opacity.

60. The harm from this policy is irreparable. Each anonymous encounter erodes civil liberties, chills expression, displaces democratic participation, and undermines public trust in governmental authority.

61. Wisconsin has not been immune from the aggressive tactics of ICE, or the consequences of its new policies.

62. ICE agents have been repeatedly observed operating in communities across Wisconsin while wearing masks and other face coverings that obscure their identity. Reports from Milwaukee, Madison, Green Bay, and smaller northern towns describe agents conducting enforcement actions in tactical gear, often in unmarked vehicles, without displaying insignia or nameplates. Residents encountering these masked officers cannot readily confirm whether they are legitimate federal agents or impersonators, which creates fear, confusion, and distrust.

63. ICE has engaged in enforcement practices throughout Wisconsin that have violated the constitutional rights of residents. In communities ranging from

Milwaukee and Madison to Green Bay and smaller northern towns, individuals have been subjected to raids, courthouse arrests, and neighborhood operations carried out without proper notice, clear authority, or adherence to constitutional safeguards. Its actions have left families fearful, undermined public trust in government, and eroded the rights that Wisconsin residents are guaranteed under the Constitution.

64. Bangstad is aware of the operations throughout Wisconsin but was unable to protest in his usual manner due to the anonymity of the individuals involved.

65. Had the individuals been identifiable, Bangstad would have used his public platform to direct criticism at those involved and call out their conduct specifically, as is his custom.

66. Additionally, the widespread use of military style gear for enforcement of civil violations conveys a perception of danger not supported by enforcement objectives, especially when applied to nonviolent and vulnerable populations. This disconnect contributes to a sense of ambient fear, discourages civic engagement, and destabilizes public trust in government.

67. The harm caused by ICE's policies is immeasurable and extends throughout society. When officers appear masked and without insignia, no one can know with certainty whether they are legitimate law enforcement or criminals exploiting the appearance of authority. Individuals cannot rationally decide

how to respond, whether to comply, contest, or seek redress, when the identity and authority of the actor are concealed. Communities cannot speak, protest, petition, assemble, or vote with confidence when those who wield government power present themselves in ways indistinguishable from impersonators.

68. Under the APA, ICE's failure to implement basic identification requirements is arbitrary, capricious, and in violation of its duty to act transparently. Citizens lack means to determine who represents the government and how to seek remedy. That abdication warrants judicial intervention to command adherence to constitutional and statutory norms.

69. The anonymity of ICE agents erodes the First Amendment right to petition.

70. Wisconsin residents have firsthand lived the consequences, courthouse arrests, impersonations, civic confusion, and fear-driven disengagement from public life and democratic processes.

71. The harm caused by masked ICE agents is not remediable through individual lawsuits because anonymity prevents identification of actors and obscures the factual basis necessary for redress. Only class-wide injunctive and declaratory remedies can address these systemic failures

72. Plaintiff and the proposed class seek court-ordered relief that compels ICE and DHS to require visible identification of officers in all public enforcement operations, refrain from anonymity except in narrowly justified and

documented circumstances, and establish procedures for transparency, oversight, and community protections.

## CLAIMS FOR RELIEF

### First Claim for Relief
### First Amendment: Petition clause
### (Against All Defendants)

73. Plaintiff incorporates and realleges the allegations set forth in paragraphs 1 through 71 as if fully set forth herein.

74. The First Amendment to the United States Constitution declares that *"Congress shall make no law... abridging the freedom of speech... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."* This language is plain and absolute. It establishes the Petition Clause as an essential mechanism by which citizens hold their government accountable. The right to petition ensures that individuals are not silenced or rendered powerless in the face of government authority, but instead may direct grievances, seek remedies, and demand accountability through lawful channels.

75. The Petition Clause operates hand in hand with the freedoms of speech and association. Citizens must be able to communicate grievances, assemble collectively if they choose, and direct their complaints to a known branch or officer of government. Without identification of the official involved, the

right to petition becomes hollow. It is the ability to name, describe, and challenge a government actor that transforms grievances from private frustration into actionable constitutional claims.

76. Defendants' policy or practice of permitting ICE officers to operate in public without visible identification strips citizens of this foundational right. Officers engage in detentions, arrests, questioning, and searches without wearing badges, nameplates, or other markings that reveal who they are. Citizens encountering such officers cannot distinguish legitimate federal officials from imposters, nor can they later determine who performed the enforcement action against them.

77. The absence of identification is not a minor technicality. Identification is the essential thread that connects the citizen's experience of government power to the accountability mechanisms of courts, agencies, and oversight bodies. When that thread is cut, the ability to petition is lost. A person detained by an officer who refuses to identify himself cannot later direct a grievance to a supervisor, cannot file a complaint with specificity, and cannot meaningfully pursue relief in court because they cannot know who performed the act.

78. The chilling effect of this policy is immediate. A citizen subjected to anonymous authority is not only deprived of accountability after the fact but also deterred from speaking, recording, or protesting in the moment. Citizens

hesitate to exercise their rights when they do not know who is wielding the badge and cannot be sure whether accountability exists at all. The Petition Clause guarantees that the act of seeking redress is real, not illusory. Defendants' policy undermines that guarantee by ensuring that grievances cannot be tied to any identifiable actor.

79. The First Amendment does not tolerate government practices that discourage or deter the exercise of petitioning rights. The right to petition, like the freedoms of speech and press, is judged not only by whether individuals are silenced outright but also by whether government actions burden, chill, or obstruct their ability to speak out and seek redress. By making officers unidentifiable, Defendants have erected a barrier that citizens cannot overcome. Petitioning against an anonymous officer is a meaningless exercise. The right exists on paper but vanishes in practice.

80. The harm caused by this policy is not speculative. Every time an ICE officer engages in public enforcement without visible identification, citizens are deprived of the ability to pursue immediate complaints. For those arrested or detained, the harm is compounded because they cannot direct legal counsel or oversight bodies to the specific officer who acted against them. For bystanders or community members who witness misconduct, the harm is

equally severe. They cannot credibly report abuse, file affidavits, or provide testimony when the officer's identity has been concealed.

81. The First Amendment requires more than the theoretical availability of petition. It requires that petitioning be practicable and meaningful. Without identification, citizens cannot name the wrongdoer, cannot pursue grievances with precision, and cannot ensure that misconduct is reviewed or corrected. The Petition Clause exists to prevent such futility.

82. Plaintiff Bangstad is a Wisconsin resident who actively exercises his First Amendment rights by speaking on matters of public concern, criticizing government officials, and encouraging civic participation. He does so through regular rallies held at the Minocqua Brewing Company Taproom, through publications and signage, and through online platforms that reach audiences in the tens of thousands.

83. Bangstad's advocacy depends on the ability to identify government officials responsible for particular actions so that he may direct criticism at them, document their conduct, and encourage his audience to hold them accountable. His political speech includes identifying officials by name, describing their actions in detail, and urging the public to respond through lawful petition and civic engagement.

84. ICE's policy of allowing its officers to conduct enforcement operations while masked and devoid of identifying insignia prevents Bangstad from engaging in this form of core political speech. When armed federal officers act anonymously, Plaintiff cannot identify those responsible for particular enforcement actions and therefore cannot direct grievances at them or encourage his audience to do so.

85. Bangstad objects to what he perceives as the use of paramilitary-style tactics by ICE agents in carrying out enforcement actions within immigrant communities. In his view, these operations, often conducted by masked agents in tactical gear, create an atmosphere of intimidation that extends beyond any individual enforcement action and affects entire communities. He believes these practices are excessive, undermine public trust, and amount to the harassment of vulnerable populations. Consistent with his prior advocacy, Bangstad seeks to speak out against these practices and to hold those responsible accountable through public criticism and by petitioning government officials for corrective action.

86. Bangstad also objects to the specific conduct of individual ICE agents in particular incidents. For example, he strongly opposed the ICE agents' January 6, 2026 abduction of the young girl from the grocery store in Hudson, Wisconsin, which he views as unjustified and emblematic of

broader misconduct. In his view, actions like this go beyond legitimate enforcement and reflect an approach that he believes is harmful and excessive, further motivating his desire to speak out and seek accountability.

87. The use of masks prevents Bangstad from effectively protesting ICE policies by identifying and naming the individual agents involved and addressing their specific conduct. Without the ability to distinguish who carried out the actions at issue, Bangstad cannot direct his criticism at the responsible individuals or call attention to their particular conduct.

88. The concealment strips Plaintiff's speech of its force and effectiveness. He cannot highlight the misconduct of particular officers and is deprived of the necessary information to submit petitions or complaints and cannot transform incidents of government abuse into focused political advocacy. Instead, his commentary is reduced to generalities, depriving his audience of the ability to seek meaningful accountability.

89. Members of the public who attend Bangstad's rallies or follow his publications look to him to explain government actions and to identify those responsible. ICE's anonymity policy leaves him unable to provide this information, obstructing both his speech and the community's ability to act on it.

90. Plaintiff also engages in political litigation as part of his broader advocacy. He has initiated or supported lawsuits and formal complaints to challenge unlawful government actions, to contest the eligibility of candidates for public office, and to demand compliance with constitutional and statutory requirements. Litigation is one of the primary tools through which the Plaintiff seeks accountability from public officials and agencies.

91. The ability to pursue such litigation depends on knowing who is responsible for the government action at issue. When ICE officers carry out enforcement operations while masked and devoid of identifying insignia, Plaintiff cannot determine the identity of those officers or gather the information necessary to bring focused legal claims against them.

92. This concealment obstructs Plaintiff's ability to convert instances of government misconduct into actionable cases in court. Anonymous enforcement deprives him of standing facts, prevents him from naming defendants, and frustrates his ability to marshal evidence for claims of unconstitutional conduct. As a result, Plaintiff is denied access to one of the core mechanisms the First Amendment protects: the ability to petition the government for redress of grievances through the courts.

93. Defendants' policy therefore not only chills Plaintiff's speech but also obstructs his use of litigation as a form of petitioning activity. By preventing

him from identifying the individual officers responsible for enforcement actions, the policy undermines his ability to bring suits, file complaints, or otherwise pursue judicial remedies.

94. Defendants' policy of permitting ICE officers to conduct civil enforcement actions while masked and without identifying insignia therefore violates the First Amendment to the United States Constitution and has injured Plaintiff by abridging right to petition the government for a redress of grievances, obstructing accountability, and inflicting immediate and irreparable harm on his ability to engage in protected political speech.

95. Defendants may argue that anonymity protects officer safety. But constitutional rights cannot be sacrificed to administrative convenience or speculative fears. The government may not extinguish fundamental rights under the guise of efficiency or generalized security concerns. If officer safety requires certain precautions, those precautions must be narrowly tailored. That means adopting measures that protect safety while still ensuring accountability, not imposing blanket anonymity that erases the public's ability to petition altogether.

96. The Courts only permit restrictions on fundamental rights only where they serve a compelling governmental interest and are designed in the least restrictive way possible. Defendants' policy is not tailored at all. It is

sweeping and categorical. It conceals all officers in all situations, regardless of whether safety is at risk, regardless of whether there are less restrictive alternatives available, and regardless of the harm to citizens' rights.

97. The denial of the right to petition is not a temporary inconvenience but an ongoing injury. Citizens subjected to anonymous enforcement are permanently deprived of the chance to identify who acted against them. Once that opportunity is lost, it cannot be recovered. The passage of time, the erosion of memory, and the absence of records ensure that the harm is permanent.

98. Violations of the First Amendment constitute irreparable harm as a matter of law. Courts have long recognized that the loss of First Amendment freedoms, even for short periods, is an injury that cannot be compensated by money damages. The right to petition is not fungible or replaceable. Once silenced or obstructed, the injury is complete. Injunctive and declaratory relief are therefore the only adequate remedies.

99. Plaintiff brings this claim seeking declaratory as well as preliminary and permanent injunctive relief.

100. Plaintiff also requests this court grant him reasonable costs of the action, court costs, and attorneys' fees; and such other and further relief as the Court may deem just, proper, and appropriate.

**<u>SECOND Claim for Relief</u>**
**Violation of the Administrative Procedure Act**
**(Against All Defendants)**

101. Plaintiff incorporates and realleges the allegations set forth in paragraphs 1 through 100 as if fully set forth herein.

102. The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq., provides the framework for ensuring that federal agencies exercise their authority lawfully, rationally, and with accountability to the public. It establishes procedural and substantive requirements governing agency rulemaking, adjudication, and enforcement, and mandates that all agency action must not be arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

103. The APA codifies a central principle of administrative law: agencies may not impose binding rules or systemic practices without transparency, standards, and accountability. When agencies disregard these requirements, the APA empowers courts to review and set aside unlawful actions. See 5 U.S.C. §§ 701–706.

104. Defendants' policy and practice of permitting ICE officers to conduct enforcement operations while masked and devoid of identifying insignia constitutes "agency action" within the meaning of the APA. It is a systemic enforcement practice established or authorized by the Department of

Homeland Security and ICE, with ongoing legal and practical consequences for Wisconsin residents. The policy therefore falls squarely within the APA's provisions for judicial review.

105. The ICE policy was implemented without adhering to the mandatory notice-and-comment rulemaking procedures required by the APA. Section 553 of the APA prescribes a three-step procedure for notice-and-comment rulemaking: (1) the agency must issue a general notice of proposed rulemaking, ordinarily by publication in the Federal Register; (2) the agency must give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments; and (3) when the agency promulgates the final rule, it must include in the rule's text a concise general statement of its basis and purpose. Rules issued through this process "have the force and effect of law."

106. The ICE policy at issue was implemented without any notice in the Federal Register, without providing Wisconsin residents an opportunity to comment, and without publishing a statement of basis and purpose. While certain agency actions are exempt from these requirements, including interpretive rules, general statements of policy or rules of agency organization, procedure or practice, the ICE policy does not qualify for these

exemptions as it substantively affects the constitutional rights of Wisconsin residents.

107. This agency action was contrary to the Constitution and to rights guaranteed under the First, Fourth, and Fifth Amendments. By sanctioning anonymous enforcement, Defendants have created a policy that obstructs citizens' ability to petition their government, deprives individuals of due process, and subjects residents to unreasonable searches and seizures. The APA requires courts to hold unconstitutional agency actions unlawful and set them aside.

108. The policy is also arbitrary and capricious in violation of the APA. An agency acts arbitrarily when it fails to provide a rational explanation for its conduct, ignores important aspects of the problem, or fails to consider less restrictive alternatives. Here, Defendants have offered no legitimate justification for allowing officers to operate without visible identification. General references to officer safety cannot support a blanket policy that erases accountability and strips citizens of core constitutional protections.

109. The failure to consider obvious alternatives underscores the arbitrary nature of the policy. Defendants could have implemented limited exceptions for sensitive operations, or adopted unique but visible identifiers that protect

officers while still preserving accountability. Instead, they adopted a policy of categorical anonymity that extinguishes transparency altogether.

110. The APA also requires agencies to engage in reasoned decision making when instituting practices of general applicability. When an agency adopts a systemic policy affecting broad swaths of the public, it must articulate the basis for that policy, consider its constitutional implications, and ensure consistency with governing statutes. Defendants have not met those obligations. The anonymity policy was implemented without notice, without public input, without explanation, and without regard to the constitutional harm it inflicts.

111. The injury caused by this unlawful agency action is not confined to isolated encounters but is systemic and ongoing. Every Wisconsin resident faces the possibility of being stopped, questioned, or detained by an ICE officer who refuses to identify himself. The policy applies broadly, ensuring that the threat of anonymous enforcement hangs over every community in the state.

112. The inability to confirm an officer's identity creates a lasting barrier to accountability, judicial oversight, and the ability to petition for redress. When citizens cannot know who detained them, they cannot file complaints, pursue remedies, or hold the government to account. The APA was enacted

to guard against precisely this type of unchecked executive power, where secrecy replaces transparency and lawful oversight is rendered impossible.

113. Plaintiffs have standing to challenge this agency action under the APA. The APA provides that a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

114. The ICE policy directly affects the constitutional rights of Wisconsin residents, who are unable to identify federal officers conducting enforcement operations and thus cannot effectively petition the government for redress of grievances or challenge potentially unlawful detentions or arrests. This Court has jurisdiction to hear this claim and may properly set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

115. Declaratory relief is necessary to establish that Defendants' policy of officer anonymity violates the APA. A judicial declaration will confirm that DHS and ICE cannot maintain enforcement practices that are arbitrary, capricious, or inconsistent with constitutional protections. Such relief will provide clarity and guidance to both the public and the government, ensuring that enforcement activities are carried out within the limits of law.

116. Injunctive relief is likewise necessary to remedy the ongoing violations of the APA. Once an encounter occurs with an anonymous officer, the opportunity for accountability is permanently lost. The resulting harm is irreparable and cannot be compensated through damages. Only prospective relief requiring ICE officers to display visible identification and disclose their identity during public operations can prevent these injuries.

117. Class-wide declaratory and injunctive relief is appropriate. The anonymity policy applies uniformly to all ICE enforcement operations in Wisconsin and subjects every resident to the same deprivation of accountability and constitutional protections. A single injunction and declaration will therefore provide necessary relief to the entire proposed class.

118. Without judicial intervention, Defendants will continue to enforce this unlawful policy. Wisconsin residents will remain subject to encounters with anonymous officers, deprived of transparency, stripped of due process, and denied the safeguards the APA was enacted to secure.

119. Accordingly, Defendants' policy and practice of allowing ICE officers to operate without identification constitutes unlawful agency action under the Administrative Procedure Act. It was instituted without notice-and-comment rulemaking, is arbitrary and capricious, and is contrary to

constitutional rights. Plaintiff and the proposed class respectfully request that this Court declare the policy unlawful, set it aside pursuant to the APA, and enjoin Defendants from continuing the practice.

120. Plaintiff brings this claim seeking declaratory as well as preliminary and permanent injunctive relief.

121. Plaintiff also requests this court grant him reasonable costs of the action, court costs, and attorneys' fees; and such other and further relief as the Court may deem just, proper, and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, with the class as defined above;
2. Declare that Defendants' policy or practice of allowing ICE officers to work in public without identifying patches, wearing masks, and refusing to identify themselves violates the First Amendment to the United States Constitution;
3. Declare that Defendants' policy or practice of allowing ICE officers to work in public without identifying patches, wearing masks, and refusing to identify themselves was implemented in violation of the Administrative Procedure Act;
4. Issue a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 requiring Defendants to immediately implement and enforce a policy requiring all ICE officers working in public in Wisconsin to wear clearly visible identifying information, refrain from wearing masks that obscure

their identity except when medically necessary, and identify themselves when interacting with the public, pending final resolution of this case;

5. Issue a permanent injunction pursuant to Federal Rule of Civil Procedure 65 requiring Defendants to implement and enforce a policy requiring all ICE officers working in public in Wisconsin to wear clearly visible identifying information, refrain from wearing masks that obscure their identity except when medically necessary, and identify themselves when interacting with the public;

6. Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 42 USCS § 1988; and

7. Grant such other relief as the Court deems just and proper.

Dated 4/16/2026

Respectfully Submitted

*s/ Frederick Melms*

Frederick B. Melms,
Bar No. 1093957
Frederick@melmslaw.com
MELMS LAW
219 S. Main St.
Eagle River, WI 54521
Telephone: (715) 892-3023

*Attorney for Plaintiff KIRK C. BANGSTAD*